HUGHES, *Appellant from a decree of Judge of Probate, versus* DECKER *& als.*

DECKER *& als., Appellants from same, versus* HUGHES.

On an appeal from the decree of a Judge of Probate, the question of his jurisdiction in the case, cannot arise in the absence of fraud, unless it is embraced in the reasons assigned for the appeal.

The estate of an intestate must be distributed according to the laws in force at the time of the death.

If, *after* the death of the intestate, and *before* the sum to be distributed is collected, the law as to the *distribution* of the estate is changed, such change cannot affect the rights of the distributees at the time of the death.

The § 19, c. 38, of laws of 1821, providing " that if there be no *kindred* to the intestate, then she, (the widow,) shall be entitled to the whole of said residue," meant *lawful* kindred only.

Under that statute, the *mother* of an illegitimate child cannot claim to be of *lawful* kindred with her child.

ON FACTS AGREED.

APPEAL from a decree of the Judge of Probate.

George Hughes, the intestate, was the illegitimate son of Sarah Holbrook, wife of one Richard Holbrook, who, at the time of the birth, and for a long period before, was and had been absent from the country.

The said Richard and his wife never co-habited together after the birth of said George Hughes, but no legal divorce was had by either party.

Sarah Holbrook afterwards married again and died in 1835, leaving heirs, viz.:—Nancy Decker and Abigail Babson, her sisters; John Baker, Daniel Baker, Abner Baker, and Betsey Decker, children of a deceased sister.

Richard Holbrook died in 1851, leaving heirs. George Hughes died in 1832, leaving no children. Mary Hughes, the administratrix, is his surviving widow, and her marriage was in 1826.

In 1851 the administratrix received a sum of money from the government of the United States, upon an award made by the board of Commissioners on claims against Mexico, under the treaty between the United States and that government, for injuries and damages sustained by said intestate in his lifetime.

The amount thus received was more than sufficient to pay all the debts of the intestate, and the charges of administration, and a sum of above. $15,000 remained to be disposed of according to law.

Mary Hughes claimed the whole as the widow of the intestate.

The before named heirs at law of Sarah Holbrook, afterwards Sarah Cutter, claimed together one moiety of the whole.

On these facts, at a Probate Court held in October, 1852, the Judge directed distribution of the estate as follows:—

To the *widow* of the deceased, one-half thereof. And to the widow as *heir at law*, under the Act of chapter 260 of Laws of 1852, one-fourth, and to the heirs of the mother of intestate, the remaining fourth.

Both the administratrix, and the heirs of intestate's mother appealed from this decree to the Supreme Judicial Court.

The reasons filed by the administratrix were as follows:—

1. Because the said decree is contrary to, and unauthorized by the laws of the State and the statutes directing the distribution of intestate estates.

2. Because the said George died intestate leaving the said Mary his widow, and leaving no children, nor kindred, whereby the said Mary is by law entitled to the whole of the said estate remaining after the settlement of administration accounts, and said decree should have been made accordingly.

Hughes *v.* Decker.

3. Because the said decree orders a portion of said remaining estate to be distributed and paid to certain persons, (naming them,) the said several persons not being by law entitled to any share in the estate of said George Hughes.

The heirs of intestate's mother filed the following reasons for their appeal:—

1. Because the items of credit in said administration account were unreasonable, improper, unjust and illegal, and ought not to have been allowed.

(The basis of this objection was the allowance of $4000, for the commissioner who prosecuted the claim of the intestate before the board of commissioners.)

2. Because said decree is against law.

3. Because said decree is against the laws regulating the descent of the estate of deceased illegitimate intestate estates.

4. Because by the laws regulating the descent and distribution of such estates, the widow is entitled to no part of said estate either as heir or otherwise, and said appellants are entitled to the whole of said estate.

5. Because if said widow is entitled to any part of such estate, she is entitled to only one half part thereof after the payment of the just debts against said estate, and charges and expenses, and no more either as widow, heir or otherwise, and that said appellants are entitled to the other one-half of said estate to be distributed as follows, to wit; to Nancy Decker and Abigail Babson, each one third part of said one half, and said John, Daniel, Abner and Betsey the other third part of said one half in equal proportions.

6. Because said decree is erroneous in not allowing and according to the said appellants one half of such estate to which by law they are entitled.

After the appeal from the decree of the Judge of Probate, some testimony was taken by the supposed heirs, tending to show that the residence of George Hughes was in New York at the time of his death. The memorial of the widow to the board of commissioners alleged his residence to be

there. The deposition of John Babson tended to show the same. There was also a statement of Mrs. Mann which rather showed his residence to be in Wiscasset.

If additional testimony was admissible, this was to be received at the hearing.

*Ingalls,* for Decker & als.

1. The heirs are not estopped from proving that the residence of the deceased at the time of his death was in New York. Estoppels are not to be favored. There has been no binding admission of residence by the heirs or their attorney. It is not one of the facts agreed. 1 Greenl. Ev. § 186, 204.

There can then exist no reason why the proof offered should not be received.

2. The evidence offered establishes the fact that the intestate belonged to New York when he died.

3. The domicile being established in New York, the personal estate of the deceased must be distributed according to the laws of that State. The like rule prevails in the ascertainment of the person who is entitled to take as heir or distributee. Story's Conflict of Laws, § 481, a. By the laws of that State the widow is entitled to one half of the personal estate and the heirs mentioned to the other half. Statute of New York.

4. There is good authority to sustain the Court in distributing the estate according to the laws of the domicile. 11 Mass. 256; 3 Pick. 128; 2 Kent's Com. 7th edition, p. 536, and notes.

5. The 2d, 3d, 5th and 6th reasons of appeal cover this case. The terms "law" and "laws," used in those reasons of appeal, refer to and mean the law and laws applicable to this case. They refer to the laws of New York, and point out the distribution now claimed. The decree of the Probate Court should have given to those heirs one half of the estate.

6. The appearance of the heirs in the Probate Court and in this Court, and claiming to have the property distributed

according to the laws of New York, cannot affect this question of domicile, or the laws which govern it. Nor can the fact that administration is had in Maine be conclusive upon the parties as to residence.

7. But if the estate be administered according to the laws of this State, the heirs are entitled to one half. R. S., c. 93, § § 4, 18.

8. If it is urged that the above sections and the Act of 1838 in relation to illegitimate intestate estates are not retrospective, the answer is, that the property in this case is peculiar and had no existence till after ·the passage of those Acts. The treaty itself, giving the administratrix a claim against the United States, was not made till long after those Acts, for it was made as late as February 2, 1848.

As to the law of New York on the distribution of such estates, the council subsequently, on leave, furnished the Court with the following authorities: — Wendell's Black-,, stone, vol. 1, p. 459, foot note; 1 R. S., 753, § 14, edition of 1829; Kent's Com. vol. 2, p. 213, (p. 220, 7th edition;) vol. 4, p. 413.

*Evans*, for Hughes. The rights of the parties are to be determined by the statute of distributions, in force in 1832, at the death of the intestate. The Act then in force was c. 38, § 19, of laws of 1821. The same provision is incorporated in R. S., c. 93, § 19. The intestate died without issue. Did he leave any kindred? If not, the whole residue goes to the widow. The mother is not in law "of kindred."

An illegitimate *has no kindred*, other than his own lawful issue; nor has he parents — the son of nobody. This is abundantly established.

" The incapacity of a bastard consists principally in this, that he cannot be heir to any one, neither can he have heirs but of his own body; for being *nullius fillius* he is therefore of kin to nobody, and has *no ancestor* from whom any inheritable blood can be derived." 1 Black. Com. 459. 2 Kent's Com. 212, uses the same language and cites Co. Litt. 123, a,

and adds, "Selden says that not only the laws of England, but those of all other civil states, exclude bastards from inheritance, unless there was a subsequent legitimation."

"Nor can they transmit by descent, except to their own offspring, *for they have no other heirs.*" 4 Kent's Com. 413.

On the same page, Kent comments on the Laws of Maine and other States, and considers that the disabilities of bastards by the English common law, exist *in their full extent here.*

They have since been mitigated in some degree, by an Act passed in 1838, incorporated into R. S., c. 93, §§ 3, 4. *Cooley & al.* v. *Dewey & al.,* 4 Pick. 93, is directly in point.

The word "kindred" or "next of kin" must mean *lawful* kindred, as the word "child," whenever used in the statute, means "lawful" child.

Bouvier, Law Dict. title Parent, defines "parents" to be the *lawful* father and mother of the party spoken of. *Barwick* v. *Miller,* 4 Desau., to the same effect.

In *Priestley & ux.* v. *Hughes,* 11 East, 1, it was held, that the words "father, mother," in a statute requiring consent to the marriage of a minor daughter, meant "*lawful*" father and mother, and that the marriage of a minor illegitimate daughter, though *with the consent of the natural mother,* was void.

1 Coke Litt. § 188, b, says : — " And for the same reason, where the statute of 32 H. 8, of Wills, speaketh of children, bastard children are not within that statute, and *the bastard of a woman is no child within that statute,* where a mother conveys lands unto him."

The R. S. of Maine recognize the same doctrine, c. 1, § 3, No. 9. "The word "*issue,*" as applied to the descent of estates shall be construed to include all the *lawful* lineal descendants of the ancestor."

The statutes of Maine, therefore, in giving to the "mother" or to the next of "kin," mean always *lawful* mother or kin.

The rights of the parties must then be determined by the Act of 1821, and not of 1838. *Hastings* v. *Lane*, 15 Maine, 134; *Smiley* v. *Walker*, 31 Maine, 544; *Stuart* v. *McLeod's Ex'ors*, 2 McCord Ch. R. 354.

If the Act of 1838 is to be construed as retrospective, it is unconstitutional and void. *Bank* v. *Freeze*, 18 Maine, 110; 24 Maine, 530; 2 Greenl. 275; 6 Greenl. 112; 27 Maine, 220.

If it be contended in behalf of the appellees, that the distribution is to be made, not according to the laws of Maine, but to those of New York, upon the ground that the domicile of the intestate was there, we answer:—

1st. That the fact was not so, and the proofs in the case, if admissible, do not establish it.

2d. That the appellees are estopped by their own acts of record from alleging the fact, even if it be so.

3d. That if the fact be established, the result will be that the whole proceedings must be quashed. Neither this Court nor the Probate Court had jurisdiction. No decree can be made in the case. There was no property in this State to be administered, and if there had been, the administration here should have been ancillary, and not principal.

4th. A more satisfactory answer than all, is, that by the laws of New York, the appellant is entitled to the whole, their laws in this respect agreeing with our own.

In support of the 1st answer, the case was presented in the Probate Court upon agreed facts, and the same were to be the basis of the decision in this Court.

In the appeal taken by the present appellees it is not assigned as one of the reasons, that the domicile was elsewhere than in Maine, or that other statutes were to govern.

It is too late now to receive proof.

As to the 2d, the appellees have uniformly asserted that the domicile of the intestate was in Wiscasset, in the county of Lincoln, and this is of record.

He is so called in the letters of administration, and so styled in the *notice of appointment* duly published, February, 1844.

Also, in a petition to the Judge of Probate, May 5, 1851, the appellees style themselves, "heirs at law of Geo. Hughes late of Wiscasset in said county" of Lincoln, and in the appeal by them in this case, the same description occurs. These papers are in the case.

They are estopped by the record, to which they are parties. The objection comes too late. It should have been made when administration was granted, of which due notice was published.

As to the 3d—It is clear in the case supposed, no jurisdiction vested in our Court. *Sigourney* v. *Sibley*, 21 Pick. 101.

4th. The laws of New York give the whole to the widow.

If so, this removes the only ground upon which the appellees hope to stand.

The estate in question is *personal*, and goes to the administratrix for *distribution*, according to the statute of distribution.

If it were *real* it would *descend* according to the law of *descents*, and these statutes in New York do not transmit to the same persons, as is the case in Maine.

By the statute of descent there, the mother of an illegitimate inherits. Not so, by the statute of distribution.

The *real* may go to the natural mother; the personal cannot.

Cutting, J. — George Hughes died in 1832, intestate, leaving no property, except a claim for injuries and damages by him sustained, against the government of Mexico, which his widow, the appellant, in 1851, recovered as administratrix on his estate. The intestate left no children, and was himself illegitimate; but left a mother, since deceased, leaving collateral heirs, who claim either directly or by representation a moiety of the property, while the widow claims the whole.

By the common law, the intestate, being *filius nullius*, could have no ancestral or collateral heirs, and leaving no

children or lineal descendants, his estate at his decease would have escheated to the State.

But the Legislature have in some particulars changed that law, and by the law thus changed or mitigated, we must be governed in our determination as to the respective rights of these parties, which are to be decided as provided by statute "regulating the descent of intestate's estates," in force at the time of the husband's decease.

Section 19 of chapter 38, of the laws of 1821, provides, after the payment of debts, funeral expenses, &c., that "if there be no kindred to the said intestate, then she (the widow) shall be entitled to the whole of said residue." And we are satisfied that the term kindred, as used in this statute, means lawful kindred, and that the mother could claim no such relationship. *Cooley* v. *Dewey*, 4 Pick. 93.

But it is contended that the statute of 1821 was altered by that of 1838, c. 105, § 2, and incorporated into the R. S., c. 93, § 4, which is, that if any illegitimate child shall die intestate, without lawful issue, his estate shall descend to his mother; or, in case of her decease, to her heirs at law, and that the statute is retrospective and vests the whole estate in the appellees. Upon this point it is sufficient to remark, that the words of the statute are clearly prospective, indicating no expressed intention of a retrospective operation. *Hastings* v. *Lane*, 15 Maine, 134.

Neither do we perceive any force in the position, that because the claim was collected subsequent to the alteration of the law, although it accrued before, that the latter statute is to govern. With more propriety, it might be argued, if in this case the widow's memorial could speak, that the sum recovered before the Commissioners on Mexican Claims was allowed to her *personally* as a small compensation for her bereavement.

But a more important question arises as to the original jurisdiction of the Judge of Probate, which depends, under c. 105, § 3, upon the fact, whether or not, the intestate at the time of his decease was "an inhabitant of, or resident

in," the county of Lincoln, and if not, whether the proceed-
ings before the Judge do not now preclude the appellees as
the appellants from presenting that question.

Section 22 of the same statute provides, that " the juris-
diction assumed in any case by a Judge of Probate, except
in cases of fraud, so far as it depends on the place of resi-
dence of any person, &c., shall not be contested in any suit
or proceedings whatever, except on appeal from the Probate
Court in the original case, or when the want of jurisdiction
appears on the same record."

No fraud has been proved and the Probate record, made
up from original documents, filed by both parties, describes
the intestate, invariably, as " late of Wiscasset in the county
of Lincoln."

Is that question now properly before us on the appeal?
It seems not to have been made at the final or any prelimi-
nary hearing before the Judge of Probate, but the conten-
tion then was as to the distribution of the estate under the
existing laws of this State, and particularly that of 1852, c.
260, referred to in the probate decree.    But the appellants
are not prohibited from showing such want of jurisdiction,
provided it comes legitimately within any one of the reasons
of their appeal filed in the probate office, to which by law
they are strictly confined.

The first reason assigned; to wit, " Because the items of
credit in said administration account were unreasonable, im-
proper, unjust and illegal, and ought not to have been allow-
ed," clearly admits the jurisdiction of the Probate Court.
The other five reasons are in substance, that the decree is
against law; against the law regulating the descent of the
estate of deceased illegitimate persons; that the widow is
entitled to no part of the estate and the appellants are en-
titled to the whole; but if to any, only to one half and the
appellants to the residue; and consequently in not so deter-
mining the decree is erroneous.

Now to what laws regulating distribution did the appel-
lants refer? To the laws of this, or of a foreign State, as now

contended for by their counsel? If to the latter, it is even then difficult to perceive any intentional impeachment of jurisdiction, but rather a submission to that tribunal, of which complaint is now made, that its decision was erroneous, because instead of being governed by the statute of 1852, then in force, and by virtue thereof distributing to the appellants one half, it gave them only one fourth part of the estate. But the Act of 1852, an Act, it would seem, of special legislation and very beneficial to the appellants, had it been constitutional, was repealed by the Act of 1853, c. 37, and the great trouble now seems to be, that the change in the law after the appeal, did not change the construction to be given to the reasons previously assigned for the appeal.

If it were intended to raise the question of jurisdiction, it must be admitted that the appellants were endowed with a degree of prescience truly remarkable, and a want of language to communicate such fact equally so, for the domicile of the intestate at the time of his decease was not questioned in the Probate Court, and the evidence of that fact was procured long after the appeal, but not long after the repeal of the Act of 1852. If the appellants had designed to have put in issue a question of jurisdiction, they could very easily have assigned it specifically, as one of their reasons, as in *Harvard College* v. *Gore*, (5 Pick. 370,) which would have left nothing for inference or controversy.

We are not satisfied that either of the reasons assigned puts in issue the jurisdiction, and consequently the testimony offered, other than the agreed statement before the Probate Judge, must be excluded, and the rights of the parties determined according to the laws of this State applicable thereto, and to which we have already referred.

The decree of the Judge of Probate is reversed and a decree must be entered, that Mary Hughes do retain in her hands the whole balance of said estate, and that she recover costs since the appeal.

SHEPLEY, C. J., and TENNEY, RICE and APPLETON, J. J., concurred.